John N. v Melissa A. (2024 NY Slip Op 50923(U))

[*1]

John N. v Melissa A.

2024 NY Slip Op 50923(U)

Decided on July 11, 2024

Supreme Court, New York County

Hoffman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 11, 2024
Supreme Court, New York County

John N., Plaintiff,

against
Melissa A., Defendant.

Index No. [redacted]

For Plaintiff: Dilpreet Rai, Esq., Rower LLP
For Defendant: Elayne Kesselman, Esq.
Attorney for the Child: Rosemary Rivieccio, Esq.

Douglas E. Hoffman, J.

The following e-filed documents, listed by NYSCEF document number (Motion 005) 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 35, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 69, 70, 71, 72, 73, 74, 75, 130, 135, 139, 140, 143, 144 were read on this motion to/for CUSTODY & VISITATION.
The following e-filed documents, listed by NYSCEF document number (Motion 006) 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 36, 37, 38, 131, 136 were read on this motion to/for ENFORCE/EXEC JUDGMENT OR ORDER.
The following e-filed documents, listed by NYSCEF document number (Motion 007) 77, 78, 79, 80, 81, 100, 102, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 132, 137 were read on this motion to/for CUSTODY & VISITATION.
The following e-filed documents, listed by NYSCEF document number (Motion 008) 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 101, 103, 104, 105, 106, 107, 108, 122, 123, 124, 125, 126, 127, 128, 133, 138 were read on this motion to/for INTERIM RELIEF.
In herein post-judgment matrimonial action, both parties moved and cross-moved regarding Mother's plan to relocate with the parties' child too far away for the truly daily parenting time schedule that the parties themselves (each with counsel) stipulated was in the best interest of their son. The parties' young son (the "Child") has been diagnosed with special needs and attends a private school in New York City that meets his special needs. The Mother's move with the Child is also in direct violation of the parties' stipulated provisions regarding no such move, which stipulation restricted either parents' ability to move out of Manhattan with the Child.
Unfortunately, here, Mother first put her "move" plan in action, and then filed her motion, allegedly for "permission," when she had already started the purchase of her home far outside of Manhattan. There were numerous court appearances on these motions, and extensive briefing, as well as numerous related motions (all addressed herein). Although the Court was clear with all that Mother's ability to move with the Child was absolutely not certain, and that parties should make every effort to discuss and to maintain what they had already stipulated was in the child's best interests (for both parents to live in close proximity to each other in Manhattan and for the Child to have daily or almost daily contact with each parent), Mother nevertheless cancelled her Manhattan apartment lease one year early, paid a penalty to do so, completed the purchase of a house in Katonah, and moved there, while telling the Court that she "had to be" out of her Manhattan apartment by a certain date, but not telling the Court that she did so voluntarily, let alone that she paid a penalty for her early move-out date.
Mother's alleged reasoning for this move is not that she is trying to limit Father's access to the Child, but rather that she has migraines in Manhattan that will be alleviated if she lives in Katonah. She acknowledges that her information is "self reported" to her doctors, and therefore, she assumes that Father will doubt what she says. (NYSCEF doc. 4, Def. aff.).
As Attorney for the Child pointed out in clear detail, Mother has presented no medical proof on her moving papers of this condition or this theory (see NYSCEF doc. 102, Attorney for the Child Affirmation, detailing her meeting with her young client, information from his school and doctors, lack of any supporting documentation on Mother's motions, as well as importance to the Child of both of his parents).
Then, after that affirmation from Attorney for the Child, then, Mother finally did present a letter from a doctor on a May 2024 reply on motion sequence 007 (NYSCEF doc. 118), which letter does not address her alleged need to move, let alone as far away as she did. Even if the Court were to accept the alleged medical "proof" submitted here, it does not meet, let alone require, the solution Mother chose. Even if the Court were to accept Mother's theory that she would medically feel better in a house with a backyard, there is no basis for a house so far away from her most recent apartment, when there are backyard houses throughout New York City, from Queens, Bronx, Brooklyn, and Staten Island, not to mention cities and towns immediately outside New York City that are not nearly as far away as Katonah. Nor was there any information about the extent of the alleged improvement that could be obtained from a move to a backyard-house, nor was there any medical information about what other treatments or remedies could be considered, and the comparative effects and migraine reductions of one method versus another. And even if, with truly no medical evidence submitted for it, the Court were to somehow accept Mother's theory that a move to a backyard-house will be a cure, there is no evidence that either Mother or her doctor explored any closer location, before selecting a house in Katonah. Nor does Mother or her doctor address, at all, whether Mother can live in the [*2]backyard-house in Katonah with its alleged (although not demonstrated) medical benefits, but still travel with the Child into Manhattan for his parenting-time exchanges with Father, doctor appointments, and all the other necessary reasons to come with the Child to Manhattan, and further, in that case, neither Mother nor her doctor address the medical necessity, benefit or appropriateness of the move to Katonah from Manhattan with those continuous visits into Manhattan with the Child.
There is also no evidence that Mother meaningfully considered the effect that this Katonah move would have on the Child, whether on his relationship with his Father, whom he has consistently seen either every day, or almost every day for truly years now, or on the Child's schooling. Mother has apparently proposed the Katonah public schools as a new school option for the Child, but did not present any evidence in her moving papers that she has explored the extent to which that school would be able to meet the Child's special needs, let alone whether it would do so as well as (or even comparably) to the services provided by the private school where the Child has been enrolled by both parents for several years. In this case, both parents have affirmed in their (successful) lawsuits against the New York City Department of Education for reimbursement of the Child's tuition that the New York City public schools are not able to meet the Child's needs and that his Manhattan private school [redacted] does. Mother does not present any evidence that the Katonah public school would be able to meet the Child's needs that both parents have stated the New York City public schools could not, and that his private school does.
The Court was also concerned when Mother, in direct contravention of the order appointing the Child's attorney, nevertheless refused to grant permission for the Child's attorney to speak with the Katonah schools, thus preventing the Attorney for the Child from speaking with Mother's proposed new school. This was eventually remedied, after the court appearance on the record, when all that the Child's attorney could report about the Katonah school was that they could not speak with her because of this lack of authorization from Mother. And in the meantime, Mother gave up her Manhattan apartment (early), moved to Katonah, and presented her move as done and completed. Her original motion also lacked the proposed address, although admitting that she was already "in contract" for the home at the time of her motion "for permission," nor the name of the proposed school (Father's opposition stated that there are three elementary schools in Katonah, but that Mother would not tell him which one she is proposing for the Child; his March 2024 affidavit stated Mother still had not told him the address).
Mother's gamesmanship and orchestrated timing choices created an extraordinary problem for her son, his school, his Father, and this Court. Mother created the timing, and then accelerated it, even as the motions were pending, all in direct contravention of what both parents here stipulated for, in great detail, each advised by counsel. As the Court stated on the record at the June [redacted] 2024 appearance, Mother's request to relocate to Katonah with the Child is denied, for the detailed reasons stated on the record, with written decision to follow. See NYSCEF docs. 130-33, Decision and Order on Motions sequence 005-008. That written decision is filed herein, which incorporates (without necessarily repeating) the reasons already stated on the record (see Tr).
Specifically, the parties' 2020 Stipulation (NYSCEF doc. 16), which was So Ordered by the Court after a 2020 detailed allocution on the record, states, regarding joint custody:
The Mother and the Father shall have joint legal and physical/residential custody of [the Child]. The Mother shall be deemed the residential parent solely for purposes of child [*3]support and health insurance. . .
The Parties shall consult and confer with each other, in good faith, on major issues relating to [the Child's] health (including, but not limited to, medical, therapeutic, and psychiatric treatment, extended use of prescription drugs for an ongoing illness, and dental/orthodontic treatment exclusive of annual or routine check-ups or examinations and ordinary childhood illnesses, ailments, and usual and customary drug prescriptions for such ordinary childhood illnesses and ailments), education, child care, summer camp/program, extracurricular activities, and general welfare (the "major issues") and use his/her best efforts to come to an agreement on all major issues described above. . .
All major decisions affecting the physical and mental health, discipline, education and schooling (including change in current schools and selection of schools and colleges, the necessity for testing and tutors, participation in after school extracurricular activities and summer activities), and general welfare of the Child shall be discussed between the Parties before they discuss it with the Child. It is the Parties' specific intention that they shall attempt to resolve all questions relating to the Child by discussion and mutual consent taking into consideration the Child's aptitudes and wishes. . .
The Parties will jointly decide the Child's extracurricular activities including, but not limited to, enrichment classes, sports lessons, team participation, music lessons, art lessons, and camp. While the Parties shall take into consideration the aptitude and wishes of the Child, keeping in mind his age and level of maturity, the decision shall be based upon the Child's best interests. Each Party shall cooperate and enable the Child's regular participation in the agreed upon programs or activities.
Notwithstanding the foregoing, the Child shall not be enrolled in more than two (2) extracurricular activities per semester . . .
The parties stipulated to cooperate in the Child's best interest:
The Parents shall cooperate with each other to advance [the Child's] health, emotional and physical well-being.
The parties stipulated to detailed provisions of truly frequent and "unhampered" parenting time access:
Each Parent acknowledges that the Child deserves unhampered access to both the Mother and the Father, and that the Child shall benefit most in life by having both a Mother and a Father who play an important role in his life. Each Parent shall exert every possible effort to maintain access and contact between the Child and the other Parent, and to foster a feeling of affection between the Child and the other Parent. . .
Each Party shall be entitled to attend all of the Child's organized and special events that the Child attends or in which the Child participates, including without limitation, sport matches, lessons, competitions, practices, awards ceremonies, school events, activities/functions/concerts, presentations and comparable special or school events ("Children's Events") to which Parents are customarily invited to attend and/or participate in, whether or not such school/special events occur during his or her parentingtime as set forth in this Agreement. . .
In the event the Child is sick and confined to either Party's residence for twenty-four [*4]hours prompt notice shall be given to the other Party and the other Party shall have the right to visit with the Child at the other Party's residence at mutually convenient times. The Parties shall notify each other promptly in the event of any accident involving the Child or serious illness of the Child. . .
Each Parent will ensure that during his/her access time, the Child will attend school, doctor and dentist appointments, therapy sessions, regularly scheduled activities and lessons, and other events mutually agreed to by the Parents including, but not limited to, birthday parties or other social events . . .
The parties stipulated to a parenting-time schedule, detailed over 15 pages (pages 32-46), which provides, in relevant part, that during the school year, Father is to have parenting time with the Child on every Wednesday overnight to Thursday, alternate Thursday overnights to Fridays, alternate weekends Fridays to Sundays, plus Tuesday or Thursday dinner visits, plus bringing the Child to school, camp, therapy or other organized activities every Tuesday, Wednesday, and Thursday, and alternate Fridays. Parties also stipulated that either parent also had the right to accompany the Child and the other parent on the mornings that were not "that" parent's morning, although, while these motions were pending, the parties entered into a stipulation vacating that "accompaniment" portion. In the summer months, the parties stipulated that Father could extend his alternate weekends to Mondays. Parties also made a detailed holiday and vacations schedule.
Parties specifically stipulated that this frequent schedule is in the Child's best interest:
The Regular Weekday/Weekend Schedule shall be exercised by the Parties with flexibility, good faith and cooperation in an ongoing effort to achieve their shared goal of nurturing the Child's meaningful access to, and relationships with, both Parents, as such is deemed to be in the Child's best interests. The Parties agree to be flexible and reasonable with respect to requests for changes in the Regular Weekday/Weekend Schedule to accommodate the needs of all concerned to meet any issues that may arise.
Parties also stipulated that the other would have the right of "first refusal" if the other one cannot pick up the Child, even if it were only for a pick up or drop off, truly regardless of the length of time.
Regarding any relocation with the Child (outside of Manhattan), the parties were very specific that neither parent may do so without the permission of the other parent or the Court, and it would be the affirmative obligation of the parent planning such a move to both provide advance notice to the other parent, and then, if there is no consent, to seek court permission:
The Parties agree that with the exception of the Mother's relocating with [the Child] within Manhattan, the Mother shall provide the Father with written notice (email sufficing) of her intention to relocate with [the Child] a minimum of three (3) months prior to the Mother and [the Child]'s proposed relocation outside of Manhattan. In the event the parties do not resolve the issue of the Mother's relocation with [the Child] within fourteen days of the Father's receipt of written notice of such proposed relocation, the Mother shall have an affirmative obligation to make a motion on notice to the Father requesting the Court's permission to relocate outside of Manhattan with [the Child]. Such motion shall be made before a justice of the Supreme Court of the State of New York, County of New York. The Mother and [the Child] shall not be permitted to relocate from [*5]the Mother's and [the Child's] current address, to wit: [redacted], New York, New York (or such other address within Manhattan) without written order of the Court which order shall be served immediately and personally on the Father.
The Parties agree that with the exception of the Father relocating within Manhattan, the Father shall provide the Mother with written notice (email sufficing) of his intention to relocate a minimum of three (3) months prior to the Father's proposed relocation outside of Manhattan. In the event the parties do not resolve the issue of the Father's relocation within fourteen days of the Mother's receipt of written notice of such proposed relocation, the Father shall have an affirmative obligation to make a motion on notice to the Mother requesting the Court's permission to relocate outside of Manhattan. Such motion shall be made before a justice of the Supreme Court of the State of NewYork, County of New York.
Nevertheless, here, Mother first set her relocation plan in motion, and then filed her motion "for permission" to do what she already started to do, and then, without receiving that mandatory Court order, relocated, allegedly "without" the Child but also, without having a home for him in Manhattan with her either.
To be clear, the Court cannot prevent either adult parent from relocating by themselves anywhere they wish in the world. The question is whether they may do so with the parties' child, in direct contravention of the long-negotiated, carefully allocuted, and So Ordered agreement, which was subsequently incorporated into but not merged with the parties' judgment of divorce. Here, Mother moved to Katonah. It is undisputed that there is no consent for her to do so with the Child from Father, nor is there a Court order permitting her to move with the Child.
Crucially on these motions, it undisputed that Father has been integrally involved in the Child's life, exercising his parenting time, taking the Child to school on his mornings, being with him on his overnights, dinners, weekends, holidays and vacations, joining him at school for field trips and special days, as well as pick ups and drop offs. On these motions, Mother suggests that Father's mornings before school, if counted as 15 minutes at a time, can just be combined into an hour later in the week, maybe combined with a previously scheduled overnight to Father, so that Father does not technically lose any counted minutes. Parenting time, however, cannot be counted purely as how many minutes total in a year. There is value to each walk to school, each bedtime, each dinner, each reading a book together after school, each time seeing a young child on the sidewalk right after school, whether they have had a good day or a hard day (or sometimes both all in one day), and then going home together and talking about that day. Adding one hour to a full-day weekend visit is simply not the same as also seeing the child four mornings throughout that week. Importantly, this is precisely what the parties already stipulated to — this level of frequent contact. It is undisputed that Katonah is approximately 40-plus miles away from Manhattan, which is a substantial commute, especially in the morning or during the afternoon rush hour for a child (whether that child does or does not, as here, have special needs), for this 40-plus miles between Katonah and Manhattan, that much more so if there are any traffic delays (and it would not be reasonable to say that there are no traffic delays on this route). It would not be feasible for the Child and Father to maintain their daily or near-daily contact, which Mother implicitly acknowledges by proposing this "clumping" of parenting time in lieu of father's frequent parenting time with the Child that parties stipulated to. For Mother to suggest that this is a change without consequence strains all logic and credulity. See, e.g., Lipari v. [*6]Lipari, 146 AD3d 870, 872 [2d Dept 2017] (denying relocation of 17 miles to Rye from New York City, where the other parent "had frequent contact with the children, including substantial time during the week . . . quality and quantity of the father's contact with the children during the week would be substantially impaired"); Schwartz v. Schwartz, 70 AD3d 923, 925 [2d Dept 2010] (denying relocation of 20 miles from Brooklyn Heights to Staten Island where "father had frequent contact with the children, including substantial time during the week. . . . the difficulties for both the father and the children in maintaining their current quality and quantity of contact while traveling between Brooklyn Heights and the southernmost point on Staten Island, during morning and evening rush hours in New York City traffic, is apparent. . . such onerous travel arrangements would likely affect the children's willingness to visit him as frequently as they currently do").
For the court to modify a custody agreement in the absence of an agreement between the parties to do so, it is well-established that a movant must make a sufficient showing of a material change of circumstances, and then carry the burden of proving that the change would be in the best interests of the child. Matter of McFarlane v Sapeg, 25 AD3d 766, 766-67 [2d Dept 2024] (citations omitted); Velin M. v Bermit T., 220 AD3d 521, 521 [1st Dept 2023] (citations omitted); Yvette F. v Corey J.G. Sr., 177 AD3d 549 [1st Dept 2019]. See also Brown v McGhee, 227 AD3d 983 [2d Dept 2024] (citations omitted); Alexis A.T. v Gary C.T., 204 AD3d 555 [1st Dept 2022]; Matter of Jose M.C. v Liliana C., 150 AD3d 514, 514 [1st Dept 2017]. "In order to modify an existing custody arrangement, there must be a showing of a subsequent change of circumstances so that modification is required to protect the best interests of the child. A parent seeking a change of custody is not automatically entitled to a hearing but must make some evidentiary showing of a change in circumstances sufficient to warrant a hearing." Gurewich v Gurewich, 58 AD3d 628, 629 [2d Dept 2009] (emphasis added). The court, therefore, must focus on the showing, if any, of a change of circumstances that is subsequent to the prior order. See Sergei P. v Sofia M., 44 AD3d 490, 490-91 [1st Dept 2007] ("A parent seeking a change of custody is not automatically entitled to a hearing. Where parents enter into a formal custody agreement, it will not be set aside without a showing of a sufficient change in circumstances since the time of the stipulation, and unless the proposed modification is shown to be in the best interests of the child. Furthermore, no court will modify such an order of custody granted on stipulation, absent such showings."); see also Tarpey v Tarpey, 77 AD3d 912, 913 [2d Dept 2010] ("Where a voluntary agreement of joint custody is entered into, it will not be set aside unless there is a sufficient change in circumstances since the time of the stipulation and unless the modification of the custody agreement is in the best interests of the children. Furthermore, a parent who seeks a change in custody is not automatically entitled to a hearing but must make some evidentiary showing sufficient to warrant one") (citations omitted). Indeed, where the moving parent does not meet their burden, their petition "should [be] summarily denied" (Patricia C. v. Bruce L., 46 AD3d 399 [1st Dept 2007] (a "parent who seeks change of custody must make some evidentiary showing to warrant a hearing; it is not automatically granted. In light of petitioner's failure to demonstrate any changed circumstances since the 2003 order granting custody to the father, or any evidence that he was an unfit parent, or, for that matter, any indication that continued custody with him was not in the best interests of the child, the application for modification should have been summarily denied.").
As the Court of Appeals stated in Obey v. Degling, 37 NY2d 768, 770 [1975]:
Custody of children should be established on a long-term basis, wherever possible; [*7]children should not be shuttled back and forth between divorced parents merely because of changes in marital status, economic circumstances or improvements in moral or psychological adjustment, at least so long as the custodial parent has not been shown to be unfit, or perhaps less fit, to continue as the proper custodian. The rearing of a child requires greater stability than a roller-coaster treatment of custody.
"Hearings [regarding a proposed change] have been denied and modification requests dismissed, where, as here, the allegations were conclusory and unsubstantiated." Matter of Newton v McFarlane, 174 AD3d 67, 77 [2d Dept 2019]; Matter of Feliciano v. King, 160 AD3d 854 [2d Dept 2018]. See also Werner v. Mazzenga, 174 AD3d 727 [2d Dept 2019]. Nothing in Mother's papers "tends to show" that the other parent "has since [the 2020 Stipulation] become unfit or even less fit to continue" as joint custodian of the child, and to continue their current residential parenting-time schedule with frequent and meaningful time for the child with each parent. See Zima v. Aguirre-Cotliar, 21 AD3d 828 [1st Dept 2005] (citing Obey).
Wherever possible, "[c]ustody of children should be established on a long-term basis." Obey v. Degling, 37 NY2d at 770. In this regard, the Appellate Division, First Department, has found continued stability in the child's life to be a primary factor. In Matter of Lawrence C. v. Anthea P., 79 AD3d 577 [1st Dept 2010], neither parent had a formal order of custody, although the mother became the de facto primary custodial parent for a period of years. The appellate court stated that "'[c]hanges in conditions which affect the relative desirability of custodians . . . are not to be accorded significance unless the advantages of changing custody outweigh the essential principle of continued and stable custody of children.'" Id. at 579, quoting Matter of Bennett v. Jeffreys, 40 NY2d 543, 550 [1976] (other citations omitted). Therefore, the Appellate Division continued, "'[p]riority, not as an absolute but as a weighty factor, should, in the absence of extraordinary circumstances, be accorded to the first custody awarded in litigation or by voluntary agreement.'" 79 AD3d at 579, quoting Matter of Nehra v. Uhlar, 43 N2d 242, 251 [1977]. "In short, the parent seeking the change in custody arrangements bears the burden of proof that the change is in the child's best interests". Id. at 579 (discussing changing de facto custody, not even custody after a final order or stipulation). See also Boris K. v. Marie E., 176 AD3d 504 [1st Dept 2019].
Thus, the first question is whether Mother, on her papers, has met this required standard to modify the parties' stipulation. Here, the parties specifically stipulated that it is in the Child's best interest for him to live in Manhattan near both parents, to have almost daily in-person parenting time with each parent, and to have each parent be able to participate in his pickups, drop-offs, school events, doctor visits, the minutiae of his weeks and weekends.
Mother has not met her burden even for a hearing, for the following reasons: (i) she has not presented sufficient medical basis for her alleged change of circumstances at all, filing a cursory medical letter on a reply, (ii) she did not present sufficient evidence that such a move, even if it were medically supported, requires a move as far as Katonah and nowhere closer than would be medically appropriate, (iii) she did not present any information on whether such a move to Katonah when coupled with bringing the Child to Manhattan from Katonah for parenting exchanges and other reasons would still be medically indicated for Mother (as opposed to not sufficiently medically advantageous or even contra-indicated due to increased driving for Mother, which driving she herself offered to do multiple times per week, either right before or right after the Child's school in Katonah if the Child were permitted to relocate, to Father's home [*8]in Manhattan, see NYSCEF doc. 4, Def. aff. at 11), in other words, Mother alleges that she has a medical need to live in Katonah and not in Manhattan, while separately saying that she will drive to the Child to his Father in Manhattan, but she does not say, nor does her doctor address, whether Mother driving back and forth to Manhattan is medically indicated for her, under her medical theory, or whether these drives would cancel any medical benefit she alleges she will have from the move, and thus, her proposed move and her proposal to drive the Child to maintain contact with his Father are either at odds with each other, not sincere, or there is no medical benefit, (iv) she presents no medical information about planned efficacy of this alleged medical remedy of a move as compared to other medical remedies that would not require a move, or such a distant move. Thus, as Mother has not sufficiently alleged a substantial change of circumstances (that she now has a medical reason that requires her to move to Katonah) other than in a conclusory manner, and without either medical proof, or addressing any of the above issues with her "reason", accordingly, there is no reason for the Court to even undertake an analysis whether a relocation and attendant change in parenting time for the Child if he were permitted to relocate would be in the Child's interest, as the Court may not undertake a renewed best interest analysis in the absence of a material change of circumstances. If, however, the Court were to do so, the parties themselves have already stipulated that the extremely frequent parental contact in the Stipulation is in the Child's best interest. Based on truly numerous appearances and papers in this action, both before and after the Stipulation, and numerous appearances and papers on herein motions, the Court does not see any articulated change in the Child's best interest away from this frequent contact, which forms the basis of the parties' stipulation, as stated supra. In addition, there is no credible information alleged that Father is no less capable of continuing as the meaningful co-parent that he has been for the Child. A proposed relocation of the Child to Katonah would cut out Father's meaningful parenting contact with the Child, which would not be in the Child's best interest, as that interest was already stipulated to by the parties and So Ordered by the Court, and, out of abundance of caution, reaffirmed on herein motions.
While acknowledging the long-negotiated and extremely specific relocation restrictions in the parties' Stipulation, the Court also considers the proposed relocation under the Tropea factors. Whether analyzed in concert with the required "changed circumstances" analysis discussed supra, or even purely pursuant to the Tropea factors, here, Mother's proposed relocation with the Child does not satisfy the Tropea factors at all, such that not even a hearing would be required, since there are not sufficient facts alleged by Mother to trigger such a hearing.
The Tropea factors are:
[C]ourts should be free to consider and give appropriate weight to all of the factors that may be relevant to the [relocation] determination. These factors include, but are certainly not limited to each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements. In the end, it is for the court to determine, based on all of the proof, whether it has been established by a preponderance of the evidence that a proposed [*9]relocation would serve the child's best interests.
[fn] The separation agreements [here] require only that the custodial parent apply for judicial approval before moving out of a specified area without making any mention of criteria or standards. A geographical relocation restriction agreed to by the parties and included in their separation agreement might be an additional factor relevant to a court's best interests determination.
Tropea v. Tropea, 87 NY2d 727, 740-41 [1996]
As discussed supra, there is no legally sufficient reason even stated for the relocation. Instead, what actually happened, is Mother moved and is now saying that she is in Katonah, so she created her own changed circumstances by moving (including by giving up her Manhattan apartment early and telling the Court on the record she "had to be" out of the apartment). That is not a legal changed circumstance. The alleged "medical" support for the move was similarly not presented or addressed, as discussed supra, in detail. Simply stated: there is no reason for the relocation except for Mother's preference to do so. And there is no allegation that the move would enhance the child (or Mother's) life "economically, emotionally and educationally." Id. Indeed, Mother not only did not present any information about the educational options, she blocked the child's attorney from even speaking with her new proposed school to discuss his special educational needs. On the other hand, there is uncontroverted agreement that if the Child were permitted to relocate to Katonah that much of his parenting time with Father would no longer be possible, the very detailed, and very specific frequent contact that parties stipulated is in the Child's best interest, and the very frequent (truly almost daily) that this special-needs boy has been enjoying since (and before) the parties' 2020 stipulation. For the Court to 'balance' the factors, there would have to be some factors favoring the move. Here, there are no such factors alleged, at all, let alone in any meaningful manner. Accordingly, there is truly no 'balancing' for the Court to do, when there is nothing on one side of the balancing scales, and therefore, there is no basis for a hearing. See, e.g., Cleary-Thomas v. Thomas, 200 AD3d 516 [1st Dept 2021] ("Plaintiff did not provide any evidentiary basis to show that relocation to Long Island would be in the children's best interests given that they attend private school in Manhattan and defendant, who returned to Manhattan in September 2020, has equal physical and legal custody that requires transitions every two to three days. Accordingly, the court properly denied plaintiff's application, without an evidentiary hearing, to remove the radius clause and granted defendant's request that plaintiff be responsible for transporting the children for his parenting time while she remains outside the agreed upon radius"); Gravel v. Makrianes, 120 AD3d 815, 817 [2d Dept 2014] (upholding a denial of relocation motion without a hearing, where "under the circumstances presented here, it was not necessary for the Family Court to have conducted a full evidentiary hearing in this matter, as it possessed adequate relevant information to enable it to make an informed and provident determination with respect to the best interests of the children"); see, e.g., Hardie v. Hardie, 224 AD3d 474, 475 [1st Dept 2024] (upholding an order not permitting mother to relocate with the child, stating that "wife failed to make a prima facie case that there were changed circumstances requiring a modification of the 2018 stipulation of settlement and that the proposed relocation to Pennsylvania was in the child's best interest. The court properly determined that there was no economic necessity for the relocation, the child's special educational needs could be adequately addressed in New York, and the wife's plan to relocate her parents to Pennsylvania to provide childcare was tenuous. There was a sound and substantial basis in the record for the determination that the relocation to Pennsylvania would not [*10]be in the child's best interest."); See also Erica B. v. Louis M., 218 AD3d 421, 423 [1st Dept 2023] (while mother did show that there was a material change of circumstances for her move from New York City to Rochester related to housing, "we find that the mother failed to establish the second prong of her prima facie case. . . mother failed to submit sufficient proof to substantiate her claim that the relocation would enhance the child's educational or economic condition, and she has not shown that the claimed benefits resulting from relocation would outweigh the disruption in the child's relationship with the father"); Kessler v. Charney, 206 AD3d 450 [1st Dept 2022] (upholding a relocation determination without a hearing, where both parents had moved to suburban areas outside of the city, where "Supreme Court providently exercised its discretion in determining the mother's motion to relocate with the child without holding a hearing, appointing an attorney for the child, or ordering a forensic examination. Supreme Court, which was operating under time constraints imposed by the imminent start of the school year, had sufficient, uncontroverted information before it from the parents' motion papers to make an informed decision regarding the child's best interests."); Lecaros v. Lecaros, 127 AD3d 1037, 1038 [2d Dept 2015] (upholding a relocation determination without a hearing, where "the Supreme Court possessed adequate relevant information to enable it to make an informed and provident determination, without a hearing, as to whether it was in the children's best interests to relocate with the mother to London"). C.f., Louie v. Plissner, 174 AD3d 607, 608 [2d Dept 2019] (error to deny a relocation motion without a hearing because "the mother demonstrated sufficient merit to the relocation request to warrant a hearing on so much of her petition as sought to relocate with the subject child").
Further, although not determinative on this motion, "it is the rights and needs of the child that must be accorded the greatest weight," (Tropea, 87 NY2d at 739), and here, Mother has attempted to present her needs (although, as stated supra, has not made a sufficient showing on those), and has not addressed the child's needs.
Herein motions only address the move to Katonah (and its consequences). To the extent that Mother (who only recently completed this move, just before the end of the Child's school year), reverses her move and remains living in Manhattan, Father does not seek any change in parenting time schedules, nor would there be any request or need for any such change. See, e.g., Glaser v. McFadden, 287 AD2d 902, 905 [3d Dept 2001] (finding that mother, who requested to move with the children from New York to Virginia, also stated unequivocally that she would remain in New York if her relocation request was denied, and therefore, there was no cited basis to modify parenting time even after denial of the relocation request). As previously stated in Court, any interim schedule modifications ordered by the Court in connection with these motions are only for the situation where Mother remains in Katonah and does not return to Manhattan.
Currently, it is the school summer for the Child, and now that Mother represented in Court under oath that she is already living in Katonah and does not have a current place in Manhattan, the Court had to set a parenting-time schedule that (hopefully only temporarily) deviates from the parties' carefully delineated 15-page parenting time schedule discussed supra. That summer schedule Interim Order (NYSCEF doc. 141), states, in relevant part:
The mother shall have parenting time with the subject child on alternating weekends from Friday after camp until Sunday evening drop off in New York City, at the father's residence, no later than 7:30pm.
The mother shall have overnight parenting time with the child on alternate Wednesdays until drop off at camp on Thursday morning. The mother shall have parenting time with [*11]the child every Tuesday and Thursday from pick up at camp until 7:30pm drop off at the father's residence.
This shall be the schedule for the summer of 2024 only.
This Court had also scheduled a hearing for an interim schedule for when the Child's school year resumes. For two hearings in a row, Mother has requested an adjournment, allegedly because of medical reasons, which the Court has granted. That re-adjourned hearing remains scheduled for [redacted], which date and time has been confirmed by all. As stated supra, such a schedule change is only being discussed if Mother choses to remain in Katonah, as neither Court nor Father seeks to modify the parties' carefully negotiated schedule, with which the Child has been living for years now, seeing both parents frequently, so much so, that he told his attorney, that he "lives with both of them," crediting that he has a home with each parent. [Affirmation by Attorney for the Child, NYSCEF doc. 102].
The Court would be remiss if it did not also remind Mother that it would not be helpful to place the Child in a position where he feels he needs to choose between his parents, instead of enjoying a loving and guilt-free relationship with both parents who love him, as alleged. The Court reminds all that "Parental alienation of a child from the other parent is an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [offending party] is unfit to act as custodial parent." Khan v. Potder, 185 AD3d 822, 823 [2d Dept], leave to appeal denied, 36 NY3d 902 [2020]. The Court need not, on these motions, state how sad it would be to place the Child even further in the middle of these proceedings, especially at a time when his Mother is either seeking to or is relocating, and therefore, hopes that the parties support the Child's loving relationship with the other parent and do not disparage the other parent to the Child, or in his presence; the Court hopes that the parents do not suggest to the Child that he should choose which parent to live with, or to inquire (in the Child's presence) if the other parent will "permit" him to live with the parent allegedly asking these not-child-appropriate questions in front of the child. If Mother remains steadfast in her decision to relocate even without the Child, the Court is hopeful that she will not attempt to make the Child feel guilty about her choice and for the Child's continued meaningful relationship with his father.
Decision and order on the motions has already been filed. This original Supplemental Order is filed by the Court on NYSCEF, which shall constitute filing and entry. Plaintiff is hereby directed to file a Notice of Entry of herein Decision and Order within five days.
DATE 7/11/2024
DOUGLAS E. HOFFMAN, J.S.C.